**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| INTERNATIONAL FINANCIAL SERVICES CORPORATION, an Illinois corporation, | ) ) ) ) | |
| Plaintiff, | ) ) ) | No. 00 C 6433 |
| v. | ) | |
| CHROMAS TECHNOLOGIES CANADA, INC., a Canadian corporation, | ) ) ) ) | HONORABLE DAVID H. COAR |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff International Financial Services Corporation ("IFSC") filed a five-count Amended Complaint in this Court alleging breach of contract, fraud, conspiracy to defraud, unjust enrichment and constructive trust against, *inter alia*, Didde Corporation ("Didde"), Didde Web Corporation ("DWP"), Chromas Technologies, Inc. ("CTI"), and Chromas Technologies Canada, Inc. ("CTCI"). On September 30, 2002, IFSC went to trial, against CTCI only. On October 7, 2002, the jury returned its verdict. The jury found: (1) CTCI was the alter ego of Didde; (2) CTCI was liable for breach of contract; and (2) CTCI was not liable for fraud. The jury returned a verdict of $1,099,277.39 against CTCI, and this Court entered judgment on the verdict. On October 28, 2002, this Court denied CTCI's motion for a new trial.

Subsequently, CTCI appealed the jury verdict on the grounds that the Court, and not the jury, should have decided whether to disregard the corporate entity and pierce the corporate veil. The Seventh Circuit determined that in Illinois, corporate veil-piercing is an equitable remedy to

-1-

be determined by the court.  See International Financial Services Corporation v. Chromas Technologies Corporation, 356 F.3d 731, 737 (7th Cir. 2004).  Additionally, CTCI contended that the jury award was excessive, thereby requiring a new trial on the issue of damages. See id. at 739.  The jury awarded IFSC $1,099,277.38 for its breach of contract claim even though IFSC alleged only $949,649.60 in damages. The Seventh Circuit determined that, if this Court decides to pierce the corporate veil, it must enter an award of damages in the amount of $949,649.60.  Id. at 739.  Thus, the Seventh Circuit vacated the October 7, 2002 judgment, and ordered remand of this case for a determination of whether to pierce the corporate veil and for an entry of judgement in the amount of $949,649.60 if this Court decides to pierce the corporate veil.  Id.

Subsequent to the Seventh Circuit's order, the Parties have filed cross-motions for this Court to enter findings of fact and conclusions of law in their favor.  Consistent with the directive of the Seventh Circuit, this Court hereby enters the following findings of fact and conclusions of law:

**I.      FINDINGS OF FACT**

1.  Plaintiff International Financial Services Corporation ("IFSC") is an Illinois corporation with its principal place of business in Libertyville, Illinois.

2.  Defendant Chromas Technologies Canada, Inc. ("CTCI") is a Canadian corporation chartered under the *Companies Act* (Quebec), with its principal place of business in Quebec. During the time period relevant in this case (March 1999 through May 2000), Didde Corporation ("Didde") owned CTCI.

3. IFSC is in the business of financing printing press equipment for small to medium sized businesses.

4. Over the years, IFSC financed many new printing presses in this manner, including Aquaflex, Webtron and ZigZag brand presses.

5. Although the companies that made these presses had previously been independent competitors, by 1998, they were all owned by one company, the Didde Corporation.

6. In a March 1999 press released entitled "Didde Announces the Formation Of New Company" Didde announced the formation of Chromas Technologies, "a new company which brings together the expertise of three of the industry's leading press manufacturers: **Aquaflex, Webtron,** and **ZigZag**." (Pl. Ex. 16 (emphasis in original)). Didde billed the new company as a division of Didde Web Press Corporation ("DWP"), a subsidiary of Didde.

7. Further, the press release stated: "As one company, Chromas incorporates the brands of Aquaflex, Webtron, ZigZag and the DLA (Digital Label Alliance)." (Pl. Ex. 16).

8. Moreover, the press release provided comments from David Didde, president of the Didde Corporation. In relevant part, David Didde stated, "Chromas' ability to approach the marketplace as a single entity with the best technologies from conventional brands and the latest technologies from the DLA will enhance our customers' success at the leading edge." (Pl. Ex. 16).

9. Additionally, the press release listed a telephone number in Montreal, Quebec to call for further information regarding the merger, and stated, "the new organization will display

some of its newest equipment" at the April 1999 CMM International trade show at the Chicago McCormick Place Exhibition Center. (Pl. Ex. 16).

10. Frank Seeds ("Seeds"), owner and president of IFSC, attended the 1999 CMM International Trade Show. Additionally, Robert Anderson ("Anderson"), president of Chromas Technologies, invited Seeds to the pre-show internal sales meeting, and asked Seeds to speak at that meeting. Seeds was also asked to stand on the podium at the ribbon cutting press conference held for the industry media.

11. In preparation for the 1999 CMM International Trade Show, Chromas Technologies held a pre-show meeting with its sales staff. Chromas' sales staff was told that they were now all one company, and thus they should throw out their old business cards and use the new Chromas cards.

12. Seeds was able to observe many of Chromas Technologies' promotional items for the 1999 CMM International Trade Show. Chromas' officers and personnel introduced a new printing press, called "The Producer," a press that was manufactured at its Canada plant. There were also: (1) CD-Roms that discussed the merger and "The Producer;" (2) Chromas Technologies t-shirts; (3) Chromas Technologies golf balls.

13. Seeds observed that Chromas Technologies had a booth for the show with "Chromas" inscribed everywhere. At prior shows, booths had signs denoting "Webtron," "Aquaflex" and "ZigZag."

14. After the trade show was complete, through the summer and into the fall of 1999, Chromas ran ads in trade magazines announcing the merger.

15. The Chromas Technologies merger was intended to integrate into one operation the Didde Corporation's various operations in Kansas, Fort Lauderdale and Canada. As part of this process, departments were eliminated, and various functions across plants were newly described as "Centers of Excellence."

16. Natasha Friedenberg ("Friedenberg") was put in charge of the sales processing Center of Excellence. As such, she supervised personnel in Montreal, and Fort Lauderdale, Florida (where she was based). Other Centers of Excellence managers had direct supervisory responsibility over personnel that were in different states or countries.

17. After the merger, personnel in Montreal and Fort Lauderdale theoretically were able to access the same computer database. That access was intended to allow the Fort Lauderdale plant to prepare quotations for the Montreal plant, and vice-versa.

18. Before the merger, the Fort Lauderdale and Montreal plants used a purchase order system to account for equipment one plant sold on behalf of the other. However, after the merger, Fort Lauderdale and Montreal simply split the profits 50-50.

19. Shortly after the CMM Trade Show in April 1999, Friedenberg learned that the announced merger never happened. However, not everyone in the company was aware that the merger did not occur. Friedenberg testified that she did not believe that anyone who was below her level in the company would have known that the merger did not occur. Moreover, information that the merger did not occur was not disseminated to the public.

20. Chromas' senior officers and directors, however, knew that the statements and representations made regarding one, merged Chromas Technologies entity were false.

21. Even though the merger did not occur, the Montreal and Fort Lauderdale operations, though technically separate companies, operated as one entity under the direction of the same personnel. For example, David Didde was an officer and director of Didde Corporation, Chromas Canada and Chromas Technologies, a division of Didde Web Press. Anderson, Chromas Technologies' president, was the president of Chromas Canada, and the Senior Vice President of the Didde Web Corporation. To facilitate cash flow management between the operations, Anderson put a structure in place for weekly cash flow meetings involving all parts of Chromas Technologies.

22. When their interests conflicted, Chromas Canada dominated its Florida affiliate, Chromas Technologies, a division of Didde Web Press. The Florida plant would, at times, satisfy the Canada plant's obligations, even as the Florida plant was unable to satisfy its own obligations.

**The Label Tech Press**

23. In the fall of 1999, at the Graph Expo Show at McCormick Place in Chicago, Frank Laughlin ("Laughlin"), Chromas Technologies' Vice President of Marketing approached Seeds about financing for a new prototype press that Chromas hoped to build for a new El Paso, Texas company named Label Tech, Inc. (hereinafter referred to as the "Label Tech Press"). The prototype press was to built in the Fort Lauderdale Florida plant.

24. The prototype press was more expensive than other presses, contained a large percentage of Original Equipment Manufacturer ("OEM") parts, and promised to be a significant breakthrough in the industry. Laughlin told Seeds that the OEM parts for this press

would cost approximately $950,000, and higher than normal progress payments were needed to purchase the equipment to build the press.

25. IFSC agreed to the financing terms for the machine. To do so, however, IFSC had to borrow the funds to pay for the machine and thus would incur interest charges on the money it borrowed in the process. Specifically, once IFSC had financed fifty percent of the cost of the press, Seeds told Chromas IFSC would incur $7,858 per month in interest charges. Because the costs of financing the machine were so high, Seeds informed Chromas Technologies that it was relying on a definite, eight month schedule for shipping the press.

26. Subsequently, IFSC issued a purchase order to "Chromas/Webtron" for the Label Tech Press, for the total of $1,870,342. This Purchase Order called for a twenty percent deposit upon acceptance, a "progress payment" of ten percent sixty days thereafter, a second progress payment of twenty percent after 120 days, a payment of forty percent on press acceptance, and a final payment of ten percent within thirty days after the press was shipped. Although the Purchase Order IFSC issued for the press references a Machine Order and Contract between Chromas Technologies and Label Tech, the Purchase Order is the only document that evidenced the agreement between Chromas and IFSC regarding the initial purchase of the press.

27. Understanding that the Purchase Order and the underlying Machine Order and Contract with Label Tech had been "accepted," IFSC borrowed $374,068.40 on its line of credit and issued a September 30, 1999 check in that amount to "Chromas Technologies."

28. IFSC's leasing arrangement with Label Tech provided that Label Tech's obligation to pay–including a six month grace period–would begin once IFSC had funded 50% of the purchase price. As a result, IFSC also required Label Tech's authorization for each of the progress payments it made. IFSC received the initial authorization from Label Tech and sent the check to Chromas Technologies.

29. When Chromas accepted the first check from IFSC, it had not accepted the underlying Machine Order and Contract that Label Tech's president, Juan Sanchez ("Sanchez"), had signed. Despite this lack of acceptance, neither Laughlin or anyone else at Chromas advised Seeds at the time that the underlying Machine Order and Contract that Sanchez had signed had not been accepted by Chromas.

30. In December 1999, Seeds received a call from Laughlin, who requested that IFSC fund the next ten percent progress payment. Seeds inquired into the status of the Label Tech Press, and Laughlin assured Seeds that everything was fine. Laughlin told Seeds that the O.E.M.'s were in need of additional money to adhere to the production schedule. After receiving authorization from Sanchez, Seeds authorized the next ten percent progress payment. Accordingly, a check to the order of "Chromas Technologies" in the amount of $187,034.20 was drawn and sent.

31. On December 21, 1999, after the check had been received and cashed, Laughlin signed the underlying Machine Order and Contract.

32. In mid-February 2000, the time of the next progress payment, Gerald Brown ("Brown"), the vice president for finance for the entire Didde Corporation, told Seeds that if IFSC

did not advance the next twenty percent progress payment right away, the O.E.M.'s would not keep the Label Tech Press on high priority.

33. Seeds called Sanchez to obtain Label Tech's authorization to fund the next payment. Since this payment would constitute fifty percent of the purchase price, Label Tech's six month grace period for paying the lease payments would start once this payment was made. Since Sanchez was informed that the press was on schedule, he authorized the payment. IFSC wired $388,547.40 to Chromas Technologies.

34. In May 2000, Brown informed Seeds that he needed more money to continue the Label Tech Press, and in addition, the press would be about a month late.

35. Seeds did not agree to advance more money to Chromas, and subsequently, began to make calls to people he knew at Chromas. Brown called Seeds with a turnaround expert, Howard Sutker, on the line. Brown told Seeds that Chromas would not be able to start the Label Press until IFSC advanced Chromas $900,000.

36. Plaintiff and Defendant agree that LabelTech never received the press and that Plaintiff has not been refunded its money.

## II. CONCLUSIONS OF LAW

### A. THE STANDARD FOR PIERCING THE CORPORATE VEIL

Where one corporation is merely the alter ego of another, courts will disregard the corporate form. However "the doctrine of piercing the corporate veil is the rare exception, applied in the case of fraud or certain other exceptional circumstances . . . and is usually determined on a case-by-case basis." Dole Food Co. v. Patrickson, 538 U.S. 468, 475 (2003)

(citations omitted). Under Illinois law, the inquiry is two-part, and recited <u>Van Dorn Co. v. Future Chemical and Oil Corp.</u>, 753 F.2d 565 (7th Cir. 1985):

> Under Illinois law, a corporation is a legal entity separate and distinct from its shareholders, directors and officers, and, generally, from other corporations with which it may be affiliated. However, a corporate entity will be disregarded and the veil of limited liability pierced when two requirements are met: '[F]irst, there must be such unity of interest and ownership that the separate personalities of the corporation and the individual [or other corporation] no longer exist; and second, circumstances must be such that adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice.'

<u>Id</u>. at 569-70 (internal citations omitted).

The facts presented at trial show that this two-part test for piercing the corporate veil has been met. Consequently, this Court will disregard the corporate form and hold Defendant liable for Plaintiff's breach of contract claim.

### B. THE FIRST PRONG OF THE <u>VAN DORN</u> TEST

Plaintiff has satisfied the first prong of the <u>Van Dorn</u> test. In order for the Court to disregard the corporate form, Plaintiff must first show such unity of interest or ownership among Didde Web Press Corporation and Defendant that their separate personalities no longer exist. As explained in <u>Van Dorn</u>:

> **In <u>Main Bank of Chicago v. Baker</u>, the Illinois Supreme Court's most recent discussion of the Illinois law of disregard of corporate entity, the Court similarly stated the two-part test of the Illinois single entity theory: 'Generally, before the separate corporate identity of one corporation will be disregarded and treated as the alter ego of another, it must be shown that it is** so controlled and its affairs so conducted that it is a mere instrumentality of another. . . .'

<u>Van Dorn,</u> 753 F.2d at 570 (citing <u>Main Bank of Chicago v. Baker</u>, 427 N.E.2d 94, 102 (Ill. 1981)). Illinois courts have considered the following factors in determining whether this first

prong has been met: (1) failure to maintain adequate corporate records or to comply with corporate formalities; (2) commingling of funds, assets [or identities]; (3) undercapitalization; [and] (4) one corporation treating the assets of another corporation as its own[;(5) holding one's self out as being a unified entity; and (6) failure to operate at arms length. Id.

The facts presented at trial show that Canadian affiliate of Didde Corporation--CTCI–and the Florida affiliate--Chromas Technologies, a division of DWP–maintained unity of ownership. Not only were CTCI and DWP subsidiaries of the same parent corporation (Didde Corporation), CTCI and Chromas Technologies/DWP shared board members and officers. For example, Robert Anderson, senior vice president of Didde Corporation and president of Chromas Technologies, a division of DW, was listed as an officer of CTCI and participated in the sale of CTCI. Frank Laughlin, vice president of marketing for Chromas Technologies, a division of DWP, was also listed as an officer of CTCI. David Didde, of Didde Corporation and DWP, was a director of both Chromas Technologies and CTCI. Granted, sharing board members and officers cannot alone establish unity of interest and ownership: "Nor does the use of common officers and directors of itself render one corporation liable for the obligations of another." Main Bank of Chicago v. Baker, 427 N.E.2d 94, 101 (Ill. 1981). Thus, the Court finds additional evidence of unity of interest and ownership.

The facts presented at trial further show that CTCI held itself out as an entity unified with the Florida affiliate, Chromas Technologies/DWP. Testimony established that Didde Corporation intended the merger of Aquaflex/CTCI, Webtron, and ZigZag presses to present to the world the idea that one company with a single vision (Chromas Technology, a division of DWP) had combined the expertise of three leading printing presses (Aquaflex of CTCI, Webtron

-11-

and ZigZag). Testimony also established that managers such as Natasha Friedenberg oversaw employees in both Florida and Canada. When the merger was announced, departments such as the sales department, databases, and equipment in Florida and Canada combined. Testimony also established that a CTCI comptroller instructed a manager located in Florida to not worry about the Florida affiliate being made to satisfy a legal debt of the Canadian affiliate because the two affiliates actually constituted one company.

The fact presented a trial also demonstrate unity of interest in that DWP's sales force acted as the distributor of CTCI's Aquaflex printing presses in the United States and issued Aquaflex purchase orders for CTCI. Finally, the facts show that Canadian affiliate CTCI at times controlled and conducted the affairs of the Florida affiliate, Chromas Technologies/DWP. As noted above, testimony revealed that the Florida affiliate was made to satisfy, at no profit, an obligation of the Canadian affiliate.

Defendant asserts several reasons why Plaintiff has not proved the first prong of the Van Dorn test. First, Defendant argues that courts have rejected Plaintiff's "holding out" theory–the theory that CTCI held itself out as the same entity as Chromas Technologies/DWP. The case that Defendant cites on this point, CM Corp. v. Oberer, 631 F.2d 536 (7th Cir. 1980) however, does not use the Van Dorn test. In fact, CM Corp. primarily resolves the question of a parent corporation's liability for its subsidiary's obligations not, as here, the liability of corporate affiliates.

Second, Defendant argues that operating under the same or similar trade names cannot provide the basis for finding unity of interest or ownership. While true, this is not Plaintiff's argument.

Third, Defendant cites Illinois Appellate Court decisions that are distinguishable. Defendant cannot rely on Cosgrove Distributors v. Haff, 798 N.E.2d 139 (Ill. App. Ct. 2003), in which the court chose not to pierce the corporate veil. In Cosgrove, the defendants *did not* commingle funds and obligations and the corporations at issue *did* maintain distinct employees, customers, and suppliers. Defendant also argues that the facts of Kelsey Axle & Brake Division v. Presco Plastics, 543 N.E.2d 239, 244-45 (Ill. App. Ct. 1991) are "substantively indistinguishable" from the present case. This is not so. The Kelsey Court rested its determination on facts not relevant here, such as adequate capitalization, and found facts that the corporations in Kelsey conducted arms-length transactions with each other. This is also true for Jacobsen v. Buffalo Rock Shooter's Supply, 664 N.E.2d 328 (Ill App. Ct. 1996) and a Seventh Circuit case cited by the Defendant, CM Corp. v. Oberer, 631 F.2d 536 (7th Cir. 1980), in which the court upheld the district judge's decision not to pierce the corporate veil. The present case more closely approximates the facts of Hystro Products, Inc. v. MNP Corp., 18 F.3d 1384 (7th Cir. 1994), in which the Seventh Circuit found:

> This evidence was clearly sufficient for a jury to find that American Hydraulics did not maintain a corporate identity separate from MNP. In particular, MNP's close control of American Hydraulics' finances; the fact that MNP paid the salaries of American Hydraulics' officers; the informal transfers of cash between the organizations; and the absence of other corporate formalities all supported the jury's findings that American Hydraulics was the alter-ego of MNP.

Id. at 1390.

Finally, Defendant's cross-motion includes a list of facts about the Canadian affiliate which, according to Defendant, proves its lack of unity with the Florida operation. According to Defendant, CTCI is listed as a separate corporate entity on several documents, including contracts with Plaintiff; CTCI owned its own assets, including manufacturing plant in Quebec;

-13-

CTCI hired its own employees & had its own payroll; CTCI kept its own corporate books and records and paid its own taxes in Canada; and CTCI maintained separate Canadian bank accounts, lawyers and independent auditors. Some of these facts, such as CTCI's Canadian tax liability and manufacturing plant, are not enough to disturb the Court's discretion to pierce the corporate veil. International Financial Services Corp. v. Chromas Technologies Canada, Inc., 356 F.3d 731, 737 (7th Cir. 2004). Other facts, like those regarding CTCI's payroll and employees, are negated by the facts presented at trial that demonstrate some commingling of employees and employee duties. Moreover, as Defendant notes, the decision to pierce the corporate veil must rest on several factors, not one single factor. Def. Cross Motion 14 (citing In re Estate Wallen, 633 N.E.2d 1350, 1359 (Ill. App. Ct. 1994). Therefore, the fact that (1) CTCI is listed under "Canadian operations," as distinguished from a reference to "American operations" on selected corporate documents and (2) CTCI kept its own corporate books does not by itself establish that Plaintiff did not meet the first prong of the Van Dorn test.

Thus, the facts taken as a whole reveal a unity of interest among the Florida affiliate and the Canadian affiliate and, in some instances, control of the Florida affiliate by the Canadian affiliate. There exist circumstances that justify piercing the corporate veil based on unity of interest or ownership.

### C. THE SECOND PRONG OF THE VAN DORN TEST

Plaintiff has also satisfied the second prong of the Van Dorn test. In order for the Court to disregard the corporate form, Plaintiff must show not only unity of interest or ownership among DWP and Defendant, but also that adhering to the fiction of separate existence would

-14-

sanction fraud or promote injustice. Van Dorn, 753 F.2d at 570. As explained by the Illinois Supreme Court in Main Bank of Chicago, 427 N.E.2d at 102: "[B]efore the separate corporate identity of one corporation will be disregarded and treated as the alter ego of another. . .it must further appear that observance of the fiction of separate existence would, under the circumstances, sanction a fraud or promote injustice."

Defendant argues that this second prong cannot be satisfied because the jury found for the Defendant and against Plaintiff on Plaintiff's fraud claim. The Van Dorn test, however, looks to see if observing separate existence "sanction fraud *or promote injustice*." Van Dorn, 753 F.2d at 570 (emphasis added). Van Dorn addresses precisely the fallacy of Defendant's argument:

> Although an intent to defraud creditors would surely play a part [in justifying disregard for separate corporate identities] if established, the Illinois test does not require proof of such intent. Once the first element of the test is established, *either* the sanctioning of a fraud (intentional wrongdoing) *or* the promotion of injustice, will satisfy the second element.

Id. See also Sea-Land Services v. Pepper Source, 941 F.2d 519, 522 (7th Cir. 1991) (stating that, as "Van Dorn makes clear, "promote injustice" means something less than an affirmative showing of fraud).

Thus, it is not true, as Defendant argues, that the second prong requires Plaintiff to prove "an intentional scheme to squirrel assets into a liability-free corporation while heaping liabilities upon an asset-free corporation." Def. Cross-Motion 12 (citing Sea-Land Services, 941 F.2d at 524). Defendant cites Sea-Land Services too narrowly. To the contrary, the Seventh Circuit in Sea-Land Services provides an expansive definition of "promoting injustice":

> Generalizing from these [state and federal] cases [in Illinois that discuss "promoting injustice"], we see that the courts that properly have pierced corporate veils to avoid "promoting injustice' have found that, unless it did so, some "wrong" beyond a creditor's inability to collect would result: the common sense

-15-

> rules of adverse possession would be undermined; former partners would be permitted to skirt the legal rules concerning monetary obligations; a party would be unjustly enriched; a parent corporation that caused a sub's liabilities and its inability to pay for them would escape those liabilities; *or* an intentional scheme to squirrel assets into a liability-free corporation while heaping liabilities upon an asset-free corporation would be successful.

**Id. at 524 (emphasis added).**

The facts presented at trial show that Plaintiff was paying money into a Florida operation that, unbeknownst to Plaintiff, was insolvent. Chromas Technologies/DWP obtained checks from Plaintiff by representing to Plaintiff that the Label Tech press's progress was fine and, without additional funds, the press would not stay on schedule. Chromas Technologies obtained funds by representing that it was using money to build a press that was never on schedule for shipping and was never ultimately built.

Plaintiff cannot collect from Didde Corporation or DWP because those corporations are in bankruptcy. As stated in Sea-Land Services, however, this is not enough to justify piercing the corporate veil based on the second prong of the Van Dorn test satisfied. See id. This Court finds that injustice would result if Defendant, the alter ego of Chromas Technology/DWP, were unjustly enriched by keeping funds that should be used to reimburse Plaintiff for financing a press that was never built. Further, this Court finds that Defendant contributed to the insolvency of the Chromas Technologies by having the Florida operation build a press for the Canada operation at a loss. Thus, Defendant has contributed to its alter ego's liability to Plaintiff.

Thus, this Court finds that Plaintiff has "shown the kind of injustice that would merit the evocation of the court's essentially equitable power to prevent 'injustice.'" Id. at 525. This

Court finds that it may pierce the corporate veil based on the potential for promoting injustice should it recognize the separate existence of Defendant and Chromas Technologies/DWP.

### D. DAMAGES

The final issue is the jury's award of damages. The Seventh Circuit ruled that it was "irrational for the jury" to award damages of $1,099,277.38 for breach of contract--an award that exceeded the amount Plaintiff claimed by $149,627.78. <u>International Financial Services Corp. v. Chromas Technologies Canada, Inc.</u>, 356 F.3d 731, 739 (7th Cir. 2004). The appellate court ordered this Court to reduce the award should it decide to pierce the corporate veil. <u>Id</u>.

Because this Court has decided to disregard the corporate form, it must also reduce the jury's damages award to $949,649.60.

## CONCLUSION

For the foregoing reasons, this Court enters judgement in favor of IFSC and against CTCI in the amount of $949,649.60.

Enter:

  __/s/ David H. Coar_____
David H. Coar
United States District Judge

Dated: **September 19, 2005**